IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CJN, LLC,<br>An Illinois Limited Liability Company<br><br>Plaintiff,<br><br>v.<br><br>Edward O'Neill,<br>A Citizen of the Republic of Ireland, and<br>Sandra O'Neill,<br>A Citizen of the Republic of Ireland,<br><br><br><br><br><br>Defendants. | No. |

## COMPLAINT

### Introductory Statement of Facts

The Plaintiff in this cause, CJN, LLC, and Illinois Limited Liability Company, seeks damages against the Defendants, Edward O'Neill and Sandra O'Neill, in excess of $300,000,000(U.S.). This cause of action results from the sale of 3.8 Million metric tons of D2 diesel Gost oil per month for a period of 60 months, by Gazprom, a Russian Corporation, and NIB Petroleum, a Venezuelan Corporation, to United Petroleum/Birlesik Petrol S.A., a Turkish Corporation. The Agreement for this sale was executed on or about September 20, 2008. Pursuant to that Agreement, United Petroleum/Birlesik was responsible for paying a consulting fee to the beneficiaries of the Agreement in the amount of $300,000,000 (U.S.). The beneficiaries consulted with and otherwise assisted in arranging for the sale of the oil and are entitled to an agreed portion of the consulting fee.

One of the beneficiaries, Defendant Edward O'Neill, was appointed to negotiate the terms of the consulting fee payment to the beneficiaries by United Petroleum/Birlesik.

Subsequent to the commencement of the shipping of the oil under the aforesaid September 20, 2008 agreement, on November 28, 2008, United Petroleum/Birlesik agreed to pay MDM Oil Ltd ,( hereinafter known as "MDM" )on behalf of the beneficiaries a consulting fee in the reduced amount of $300,000,000. O'Neill informed the beneficiaries the consulting fee had in fact been paid. On December 15, 2008 the beneficiaries agreed among themselves to share the proceeds of that fee, pursuant to a contract known as the SUBFEE Agreement. Their agreement was memorialized and executed on that date.  The SUBFEE Agreement detailed the manner and amounts each beneficiary was to be paid but the funds were received by Defendant O'Neill in his purported capacity as an agent of MDM but have never been disbursed to any of the beneficiaries.

Since the execution of the SUBFEE, Mr. O'Neill, assisted by his wife Sandra O'Neill, have engaged in a pattern of fraudulent misrepresentation, theft, conversion, conspiracy and fraud in order to deprive MDM and the other beneficiaries of the proceeds due to them under the SUBFEE Agreement and use the proceeds for their own benefit, in a clear breach of his fiduciary duty to the beneficiaries of said SUBFEE Agreement. Several of those beneficiaries have formed the Plaintiff and assigned their claims to CJN, LLC for the purpose of pursuing this cause of action against Mr. O'Neill and his co-conspirator.

**JURISDICTIONAL STATEMENT**

The Plaintiff, CJN, LLC (hereinafter CJN or Plaintiff) is an Illinois Limited Liability Company, with its principal place of business located in Highland Park, Illinois. JOSEPH

UNLIMITED, LLC is a Nevada Limited Liability Company with its principal place of business located in Carson City, Nevada and wholly owned by Orvalee Ferris a resident of the state of Oregon. JOSEPH UNLIMITED LLC. has assigned its claim to Plaintiff by executing an Assignment of Claims. See Exhibit A. PD LLC is an Illinois Limited Liability Company with its principal place of business located in Highland Park, Illinois. PD LLC is owned 99% by Pamela Cohen, a citizen of the state of Illinois and 1% by David Adashek, a citizen of the state of Illinois. PD LLC has assigned its claim to Plaintiff by executing an Assignment of Claims. See Exhibit B. LONDON FINANCIAL CAPITAL LLC is a Texas Limited Liability Company with its principal place of business located in Frisco, Texas and is owned 50% by Douglas Schulman, a citizen of the state of Texas and James Hunter Hebert, a citizen of the state of Michigan. LONDON FINANCIAL CAPITALLLC. has assigned its claim to Plaintiff by executing an Assignment of Claims. See Exhibit C. S INFINITE HOLDINGS LLC is a Texas Limited Liability Company with its principal place of business located in Dallas, Texas, and is owned 95% by Sterling Harris, a citizen of the state of Texas and 5% by Ms.Jamie Running, a citizen of the state of Texas. S INFINITE HOLDINGS LLC has assigned its claim to Plaintiff by executing an Assignment of Claims. See Exhibit D. GAIA INVESTMENT SERVICES LLC is an Illinois Limited Liability Company with its principal place of business located in Highland Park, Illinois and is wholly owned by Lisa Del Campo, a citizen of the state of Colorado. GAIA INVESTMENT SERVICES LLC has assigned its claim to Plaintiff by executing an Assignment of Claims. See Exhibit E. The Defendants Edward and Sandra O'Neill are citizens of the Republic of Ireland. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. 1332 (a)(2).

**FACTS COMMON TO ALL COUNTS**

In September 2008 Gazprom, a Russian Corporation (hereinafter Gazprom) and NIB Service Division C.A., a Venezuelan Corporation (hereinafter NIB), as sellers, entered into a series of agreements to sell 3.8 million metric tons of D2 Gost 305-82 oil per month for 60 months, to United Petroleum/Birselik A.S., a Turkish Corporation (hereinafter UP). Pursuant to that sales agreement, UP was required to pay any and all consulting fees to any beneficiaries. Beneficiaries, in the context of international oil sales, are individuals that assist the buyer and seller consummate an agreement. One of the beneficiaries, Mr. Edward O'Neill (hereinafter O'Neill), was appointed by MDM OIL, LTD. (hereinafter MDM) and the other beneficiaries as their agent to negotiate with UP regarding the payment of the consulting fee (usually in the amount of $5 per Metric Ton of oil) to the beneficiaries. At no time was O'Neill ever an owner or principal of MDM (see records of incorporation of MDM attached hereto as Exhibit F and the affidavit of Mr. Timothy Doyle, majority owner of MDM attached hereto as Exhibit G).

The negotiations between O'Neill and UP occurred in November 2008 and resulted in a negotiated consulting fee agreement to be paid ultimately to the beneficiaries in the amount of $300,000,000. This agreement was executed by Dr. Aydin Sakalli, an authorized representative of UP, and O'Neill on behalf of MDM on November 28, 2008. A copy of the consulting fee settlement contract is attached hereto as Exhibit H. Subsequent to the consulting fee settlement negotiations, the beneficiaries formalized their agreement to distribute the consulting fee among themselves. This agreement, entitled SUB FEE DISTRIBUTION AGREEMENT (hereinafter the SUBFEE), was executed on December 15, 2008, and established the procedures to be followed for the distribution of the funds in question. O'Neill is a signatory of the SUBFEE on behalf of

4

MDM, as were JOSEPH UNLIMITED LLC, PD LLC, GAIA INVESTMENT SERVICES LLC, S INFINITE HOLDINGS LLC, and LONDON FINANCIAL CAPITAL LLC. According to the SUBFEE, O'Neill was to arrange for the wire transfer of the proceeds of the consulting fee, less expenses, to Irwin Noparstak, CPA, whose firm IFN CPA, LTD. was to function as the Paymaster/ and distribute the funds to the remaining beneficiaries. The SUBFEE further specifies the amounts each beneficiary was to be paid, the banking information to be used for each payment to each beneficiary, and requires that any disputes related to the contract shall be governed by Illinois law and adjudicated in Illinois. (See SUBFEE attached hereto as Exhibit I).

Shortly after receiving the funds due to the beneficiaries from UP in November of 2008, O'Neill began communicating via email and telephonically that he was having difficulties transferring the funds owed to the beneficiaries from overseas to the United States. In these communications, O'Neill specifically stated that he was having difficulty transferring the funds from Commerz Bank, located in Berlin, Germany to the Paymaster's account located at the PrivateBank & Trust Company located in Chicago, Illinois, by way of Bank of America, New York. O'Neill further stated that he had transferred on December 8, 2008 from, Commerz Bank, Berlin, $258,777,000 to the Paymaster's account listed in the SUBFEE. However, after waiting a short period for the funds to arrive, the Paymaster informed the beneficiaries that the funds never arrived. When the remaining beneficiaries questioned O'Neill, he first denied knowledge of any problems. After a short time, he stated that he had previously enlisted the help of a friend, who he represented is an active Central Intelligence Agency officer, Carlos Jesus Navarro (hereinafter Navarro), to determine the problem with the transfer. O'Neill represented to the beneficiaries that he was working with Navarro and other individuals to transfer the funds to the Paymaster. This was purportedly had been done by a series of transactions using dormant Central

Intelligence Agency bank accounts to which Navarro had access. The funds were purportedly transferred from Luxenburg to Lichtenstein to The Channel Islands (Gurensey), to the Cayman Islands, from where the funds were purportedly transferred to CommerzBank located in Berlin, Germany shortly before December 5, 2008. O'Neill then stated to the beneficiaries stated that he transferred the funds from CommerzBank to Bank of America, New York on December 8, 2008 and that the funds had been received in the United States and transferred to the Paymaster's account.

The funds never were made available to the beneficiaries and the Paymaster never received the funds in his account. During the time period December 10, 2008 to December 24, 2008 O'Neill staged a series of conference calls with himself and Mrs. Lisa Del Campo, one of the beneficiaries. During one of those calls, O'Neill initiated a telephone call to Mrs. Del Campo, and with her on the line, purported to call the main telephone number of the Department of the Treasury and asked for Moses Bierwitz who he had previously identified to Mrs. Del Campo as someone he had been able to contact at the Department of The Treasury. An individual representing himself as a Department of the Treasury employee, named Moses Bierwitz, interviewed Ms. Del Campo and informed her that the funds were being held by OFAC , that they were being held in a "Vespro" account at the Bank of America, 137 Hyde Park Road in Taipei Taiwan and that clearing the funds should not take long, and that the beneficiaries should petition for release of the funds. Ms. Del Campo and the other beneficiaries relied on these representations of O'Neill and Mr. Bierwitz and began the process to petition the Treasury Department to release the funds in question.

After a number of inquiries during the first three weeks of January 2009, O'Neill stated on January 24, 2009, that he had learned from Navarro, that the funds had been impounded by

the Office of Foreign Assets Control of the United States Department of the Treasury (hereinafter OFAC) and that he no longer had control over the funds. O'Neill instructed the beneficiaries to contact OFAC and further that the beneficiaries should retain counsel on their behalf to recover the funds. Mr. O'Neil stated that he had been interviewed by two investigators for the Treasury Department and the Department of Homeland Security, named Thomas Hinchon and Thomas Hinfinger.

The beneficiaries retained the law firm of ReedSmith to petition OFAC for release of the funds. On February 17, 2009, the beneficiaries, through their counsel, applied for release of the blocked funds (said application is attached hereto as Exhibit J). On March 13, 2009, Mr. Sean M. Thornton, Chief Legal Counsel of OFAC, responded to the application of the beneficiaries, stating that OFAC never had any employee named Moses Bierwitz, Thomas Hinchon or Thomas Hinfinger. Further, OFAC had no record of ever blocking the funds in question. He further stated that the funds in question would not have been subject to OFAC's jurisdiction and that he believed that the beneficiaries had been "misled." (See Exhibit K).

During the same time period between the beneficiaries' petitioning the Treasury Department and OFAC response, O'Neill informed the beneficiaries, through their counsel, that the funds in question had been "caught up" in a joint Justice Department/FBI/Department of the Treasury investigation targeting corrupt federal employees and Bank of America employees ties to Columbian drug cartels. O'Neill stated that the beneficiaries should be patient and that the "investigation" would "wrap up" in approximately 90 days. O'Neill stated that he had learned of this investigation through Navarro. O'Neill further stated that Navarro had informed him, that two of the beneficiaries, GAIA INVESTMENT SERVICES LLC and its principal, Lisa Del Campo and S. Infinite Holdings LLC and its principal, Sterling Harris, were not cleared to

receive the funds. He further stated that the funds were under the control of the Financial Crimes Enforcement Network (FinCEN), United States Department of the Treasury, and being held in a "Vespro" account at the Bank of America, Taipei. He further stated that he expected approximately $160,000,000 to be released shortly and that the rest of the funds would be released within four to eight months. Those statements were false, as the Bank of America, Taipei, never held the funds in any account and in further that FinCEN does not have the authority to impound funds, but only to make recommendations to law enforcement agencies. Further, the pattern of misstatements was intended by O'Neill to prevent the beneficiaries from investigating the matter further.

During the period of March 2009 the beneficiaries made requests of certain documentary information from O'Neill, such as the initial wire transfer information from UP, the wire transfer information from Commerz Bank to Private Bank, Chicago Illinois, O'Neill's banking information, and a certified copy O'Neill's passport. Through a series of emails and telephone calls, O'Neill stated that Navarro would specifically deliver the wire transfer information requested to the offices of ReedSmith in Washington, D.C. On March 25, 2009, O'Neill stated that the information had been delivered to ReedSmith. No such delivery took place. Further, O'Neill stated that he had arranged for Navarro to meet counsel for the beneficiaries at the University Club in Washington, D.C. Counsel was present at the arranged time and place, and no one attended on behalf of O'Neill.

Over the course of the next several months, O'Neill kept defrauding the beneficiaries by maintaining that the funds were encumbered by the United States Government. The beneficiaries began contacting members of the United States Senate to investigate on their behalf. Among the

senators contacted, both Senators Cornyn (Texas) and Merkley's (Oregon) staffs investigated the matter and determined that OFAC was not in control of the funds.

On May 26, of 2009, O'Neill became involved in a separate real estate transaction located in the state of Arkansas with another of the beneficiaries. As part of that transaction, the developer requested O'Neill to assist in enhancing the purchaser's credit. As part of that credit transaction O'Neill submitted a personal financial statement, prepared by an accountant in Ireland, that reflected his net worth in the amount of $261,412,875. (See financial statement attached hereto as Exhibit L). Those funds represent the proceeds of the settlement with UP and are governed by the SUBFEE. The next day, May 27, 2009, O'Neill submitted an amended financial statement reflecting a net worth of $30,313,575. This amended financial statement constitutes an admission that O'Neill is not entitled to the proceeds of the SUBFEE beyond what is delineated in that agreement.

Throughout May through October 2009, beneficiaries continued to make inquiries with various government agencies, and independent individuals seeking to find their money. In November 2009, O'Neill came to all the beneficiaries and informed that Treasury had found the money and steps were being made to return it to the beneficiaries by Christmas of 2009.

Subsequent to this time O'Neill, in December 2009, indicated that the funds had in fact been transferred to a "Holding Account" of a bank known as PKB PrivatBank, AG, Zurich Switzerland. (Hereinafter know as PKB). O'Neill informed the beneficiaries that the next steps were that Navarro and O'Neill working with Private Bank and were assisting the bank in doing due diligence on the beneficiaries with the ultimate objective of opening up accounts for each of the beneficiaries. O'Neill indicated to the beneficiaries that upon due diligence completion by the bank, that the funds in total would be transferred to an account controlled by he and his wife,

at the bank, and they in turn would disperse the funds to the accounts of the beneficiaries which would be newly opened for the beneficiaries by PKB. O'Neill further told the beneficiaries and he was going to be the first to receive "his share" and that once he had received his money, he would then transfer the balances from his account to each of the beneficiaries who had cleared "due diligence" and that each beneficiary would then come to Switzerland to work out banking matters with PKB so they could get their money. O'Neill further told the beneficiaries that there would be "fees" to be paid PKB, but he did not know what they would be. When asked what fees he was paying, O'Neill declined to answer.

In February 2010 O'Neill informed the beneficiaries that Navarro had informed him that PKB bank had taken the funds held in the holding account, and put them into "trade" for the benefit of the bank. O'Neill informed certain of the beneficiaries that Navarro, who had been a long time customer of the bank was "furious" and would straighten things out. Novarro indicated that an employee of the bank purportedly encumbered the funds in a "trade," or derivative transaction, for a period of approximately six weeks. O'Neill sent several emails to the beneficiaries stating his frustration with PKB and that the funds, once unencumbered by said trade, would be transferred to the United States. However, the trade transaction, according to O'Neill, made a profit of $71,200,000, which he intended to share with only certain beneficiaries, after he and Navarro negotiated a settlement with the bank whereby in exchange for holding the bank harmless, they agreeed to share 50% of the profit from the transaction with PKB. O'Neill represented to the beneficiaries, through email and telephone conversations, that the funds would be made available in mid-February-early March, 2010.O'Neill further stated to beneficiaries that he and his wife Sandra O'Neill had met in Dublin Ireland for lunch in early February 2010 with a PKB employee to execute the necessary documents to arrange for the transfer of funds process.In

April 2010 certain of the beneficiaries arranged to meet O'Neill in Zurich Switzerland at PKB to arrange for the transfer of the funds to the beneficiaries. . The beneficiaries, based upon O'Neill's representations, purchased airfare from the United States and travelled to Zurich in April 2010. However, O'Neill did not attend the arranged meeting, nor did he offer an explanation for his absence. Further, the funds were not transferred to the beneficiaries and the beneficiaries returned empty handed to The United States.

On April of 2010, one of the beneficiaries corresponded through legal counsel with O'Neill demanding that the funds in question be turned over to the beneficiaries, (see correspondence attached hereto as Exhibit M). O'Neill responded to the demand via email correspondence that is attached hereto as Exhibit N. In said correspondence O'Neill admits that he had control over the funds and "sent them back to Treasury" and that the funds were held in a joint Department of Homeland Security/Federal Bureau of Investigation/Department of the Treasury fund that holds monies confiscated from "people on watch lists." O'Neill specifically declined repeated requests to provide the necessary wire information of this transfer to the beneficiaries. To the date of this filing agencies of The Department of Treasury have been unable to find any trace of any funds related to this transaction coming into treasury around the date of April 15, 2010.

O'Neill and Sandra O'Neill had control over the funds rightfully belonging to the beneficiaries of the SUBFEE for more than 19 months, and have engaged in a pattern of conduct intentionally intended to mislead the beneficiaries and delay their investigation. The beneficiaries held O'Neill in a position of trust and confidence, which he and Sandra O'Neill used to usurp their rights, by making a series of false statements regarding the location of the funds. Further,

O'Neill has admittedly used the funds to engage in transactions for his own personal profit and at the expense of the beneficiaries.

**COUNT I COMMON LAW FRAUD**

CJN adopts and re-alleges the Statement of Common Facts above as if stated in this Count word for word. From approximately November 2008 through April 15, 2010, O'Neill made multiple false statements as to the whereabouts of approximately $258,777,000 that was the rightful property of the beneficiaries to the SUBFEE. Specifically, O'Neill admits to specifically having control over the funds in November 2008, and then engaging in a pattern of deceptive statements to the beneficiaries of the SUBFEE by stating that the funds were located in several banks world- wide, then stating that agencies of the United States government had control over the funds, which the United States government has denied. As O'Neill was in control of the funds throughout the period of November 2008 to the present, each and every statement made to that end was false. O'Neill knew the statements regarding the impounding of the funds by the United States Government to be false at the time he made them, as the United States Government, specifically OFAC, has officially denied ever impounding the funds. O'Neill made the statements regarding the purported manifold difficulties of transferring of the funds with the specific intent to defraud the beneficiaries, in an attempt to disguise his theft of the funds. The beneficiaries each relied on his fraudulent statements to their detriment by hiring counsel, incurring legal and travel expenses, and forgoing legal action against O'Neill for approximately 19 months. The beneficiaries have been deprived of the benefits of the proceeds of the SUBFEE for approximately 19 months in the amount of $163,596,199, and have incurred

legal and other expenses of over $100,000 as a direct and proximate result of O'Neill's material misstatements of fact regarding the location of the funds since November 2009.

WHEREFORE, Plaintiff hereby prays that this Honorable Court enter judgment in its favor and against the Defendants in the amount of $163,596,199, for punitive damages at least equal to that amount, and any other relief this Honorable Court deems just.

## COUNT II CONVERSION

CJN adopts and re-alleges the Statement of Common Facts above as if stated in this Count word for word. Pursuant to the SUBFEE, CJN has an immediate and absolute right in a portion of the proceeds of the SUBFEE. On April 15, 2010, GAIA INVESTMENT STRATEGIES LLC made demand on O'Neill, on behalf of all of the beneficiaries, for the immediate transfer of the funds in question. O'Neill has no right to withhold the funds from the beneficiaries. O'Neill has failed to transfer the funds in question to the Paymaster, and has in fact, by his own admission, sought to use the funds for his personal profit by engaging in at least two transactions that have caused delay of payment to the beneficiaries. O'Neill has wrongfully, and without justification or authority, assumed control, ownership and dominion over the funds from November 2008 to the present, to the detriment of the beneficiaries.

WHEREFORE, Plaintiff hereby prays that this Honorable Court enter judgment in its favor and against the Defendants in the amount of $163,596,199, for punitive damages at least equal to that amount, the proceeds from the derivative transaction with PKB that occurred in February 2010 in the amount of $39,555,550, and any other relief this Honorable Court deems just.

## COUNT III BREACH OF CONTRACT

CJN adopts and re-alleges the Statement of Common Facts above as if stated in this Count word for word. The beneficiaries to the SUBFEE, executed an agreement on December 15, 2008, memorializing their agreement to share in a $300,000,000 consulting fee paid to MDM by UP. Each beneficiary of the SUBFEE was to receive a portion of that combined consulting fee in exchange for providing consulting services to MDM. Said consulting services were rendered by all of the beneficiaries. O'Neill, as an agent of MDM, and a beneficiary, was appointed by MDM and the beneficiaries to negotiate the consulting fee and distribute same to the beneficiaries pursuant to the agreements contained in the SUBFEE. The beneficiaries have met all of their obligations pursuant to the SUBFEE and O'Neill has failed to distribute the funds pursuant to the SUBFEE, in contravention of his obligations thereunder. CJN has been damaged in the amount of $163,596,199 plus pre-judgment interest in the amount of $12,325,740.90 as a direct and proximate result of O'Neill's breach of his obligations under the SUBFEE.

WHEREFORE, Plaintiff hereby prays that this Honorable Court enter judgment in its favor and against the Defendants in the amount of $163,596,199 plus an additional $12,325,740.90 in pre-judgment interest and any other relief this Honorable Court deems just.

## COUNT IV CIVIL CONSPIRACY

CJN adopts and re-alleges the Statement of Common Facts above as if stated in this Count word for word. O'Neill, with the consent and assistance of his wife Sandra, agreed to withhold the proceeds of the Consulting Services Agreement from the beneficiaries. Sandra O'Neill has assisted O'Neill by placing funds rightfully and lawfully belonging to the beneficiaries of the SUBFEE in her name. Sandra O'Neill has no lawful right to any of these funds and, acting in concert with her husband, has prevented the beneficiaries from receiving

funds rightfully theirs. By placing the proceeds from the Consulting Services Agreement in her name and assuming control over said funds, Sandra O'Neill has acted to assist O'Neill in the unlawful theft of $163,596,199 from the beneficiaries at in this cause.

WHEREFORE, Plaintiff hereby prays that this Honorable Court enter judgment in its favor and against the Defendants in the amount of $163,596,199, for punitive damages at least equal to that amount and any other relief this Honorable Court deems just.

## COUNT V BREACH OF FIDUCIARY DUTY

CJN adopts and re-alleges the Statement of Common Facts above as if stated in this Count word for word. O'Neill, as an agent of MDM has a fiduciary duty to MDM and the beneficiaries to act in their best interests and specifically to turn over any proceeds from the Consulting Services Agreement to them. O'Neill has failed to do so. O'Neill has had control of the monies owed to the beneficiaries pursuant to the SUBFEE from November 2008 through the present. He has repeatedly breached his fiduciary duty by making fraudulent statements as to the whereabouts of the funds owed to the beneficiaries and by his failure to make them available to the beneficiaries.

WHEREFORE, Plaintiff hereby prays that this Honorable Court enter judgment in its favor and against the Defendants in the amount of $163,596,199, for punitive damages at least equal to that amount, and for any other relief this Honorable Court deems just.

Respectfully submitted,

Jason R. Williams
Michael T. Sawyier
(Attorneys for the Plaintiffs)

By:   /s/ Jason R. Williams

Jason R. Williams
Sawyier & Williams, LLP
205 N. Michigan Ave., Suite 2600
Chicago, IL 60601
312-856-9741
jwilliams@epaclaw.com
Northern District ID 6281565

Michael T. Sawyier
Sawyier & Williams, LLP
205 N. Michigan Ave., Suite 2600
Chicago, IL 60601
312-856-9741
mtsawyier@epaclaw.com
Northern District ID 2464918